660 F.2d 1116
 26 Fair Empl.Prac.Cas. 1695,
27 Empl. Prac. Dec. P 32,161
Lawrence TAYLOR, Plaintiff-Appellant,
v.
MUELLER CO.; International Association of Machinists and
Aerospace Workers, Local # 56, Defendants-Appellees.
 No. 80-1095.
 United States Court of Appeals,
Sixth Circuit.
 Argued June 5, 1981.
Decided Oct. 5, 1981.
 
 Robert S. Peters, Swafford, Davis, & Peters, Winchester, Tenn., for plaintiff-appellant.
 W. Ferber Tracy, Spears, Moore, Rebman & Williams, Jerry Summers, Chattanooga, Tenn., for defendants-appellees.
 Before LIVELY and ENGEL, Circuit Judges, and PHILLIPS, Senior Circuit Judge.
 LIVELY, Circuit Judge.
 
 
 1
 In this action, brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., a longtime black employee of the Mueller Co. sought injunctive relief and back pay for alleged discrimination in employment practices. His major contention is that a seniority system agreed to by his employer and the union with which it had a collective bargaining agreement discriminates against black employees, including the plaintiff, and perpetuates historical discriminatory practices of the employer. Following a bench trial the district court filed detailed findings of fact and conclusions of law. The final judgment denied all relief.
 
 I.
 A.
 
 2
 The plaintiff was hired by Mueller Co. in 1954 and has been assigned to the "service department" of the "machine division" since that time. The service department is one of four departments within the machine division. The other three are the machine operator's department (sometimes referred to as the machine shop), the maintenance department and the tool room. Prior to 1965 the service department was all black and every Negro hired by Mueller Co. was assigned to that department; the other three departments were all white. Each department within the machine division maintains separate seniority lists. The union (I.A.M.) has represented the employees in the machine division for many years. Black employees were permitted to join the union for the first time in the early 1960's.
 
 
 3
 Since 1965 black employees have been permitted to transfer from the service department to other departments within the machine division. However, their seniority in the service department does not transfer to the other departments. If a service department employee bids successfully for an opening in the machine operator's department his seniority there begins from the date he is hired into the new department. The first black employee transferred to the machine operator's department from the service department in 1966. At the time this action was commenced 12 out of 86 employees in the machine operator's department were black. Most of the foregoing facts were stipulated.
 
 B.
 
 4
 The district court made additional findings of fact, which are not disputed. Each department within the machine division performs a separate function. Service department jobs have always carried the lowest base pay rates among the four departments and all jobs there but one have been non-incentive jobs. On the other hand, all jobs in the machine operator's department but one are incentive jobs and all have carried a higher base rate than jobs in the service department. The two exceptions are the service department position of cut-off-saw operator which became an incentive job in 1963 and the machine operator's department position of tool crib attendant which has always been a non-incentive job. Prior to 1965 the job of tool crib attendant had always been held by a white employee and was considered a part of the machine operator's department; the position of cut-off-saw operator had always been held by a black employee and was considered part of the service department. Though both jobs have been held by blacks and whites since 1965, their department categorization has not been changed.
 
 
 5
 The district court found that the interests of the service department have always been considered "sufficiently analogous" to the interests of the other three departments in the machine division to make all four departments part of the same bargaining unit. At least one other industry in the Chattanooga area engaged in similar work was found to maintain separate service and machine operator's departments; however, each department was represented by a different union. The court also found that department seniority tends to be a standard practice in heavy industry.
 
 
 6
 Additional findings of the district court are quoted in full:
 
 
 7
 Under the segregated system maintained by Mueller Co. prior to 1965, blacks were not permitted to hold jobs as machine operators although they worked directly with white machine operators often assisting in the running of certain machines or instructing newly hired whites in machine operation procedures. Likewise, blacks were not permitted to run machines, although the evidence shows that no particular skill or education level is required to hold a machine operator position. All skill necessary is developed by on-the-job training.
 
 
 8
 At all times relevant to this lawsuit, the defendant Union bargained for the four Machine Division departments as one bargaining unit and negotiated the terms for pay and seniority. Prior to 1963, however, the Union prohibited blacks from becoming union members. This policy was altered in 1963. It was not until 1965, however, that the Union negotiated a contract changing the then existing terms for seniority and bidding.
 
 
 9
 Prior to the 1965 contract, each department had its own separate seniority system and employees were not allowed to bid from one department to another. An employee's plant-wide seniority and his department seniority were identical. The effect of this system was to lock blacks into the low paying jobs within the Service Department since blacks were hired only for Service Department jobs. The 1965 contract between the Union and the employer altered the seniority system by making the Service Department an entry level department for all new employes. Employees of any department were allowed to bid out of their department based upon plant-wide seniority. However, department seniority was maintained for purposes of bidding within a department and for purposes of layoff or cutback. Therefore, a person entering a new department had no department seniority and could be rolled from his new job by a person with greater department seniority but less plant-wide seniority than the new entrant. Rolling occurred either when an employee with greater department seniority desired the job held by the new entrant or when there was a cutback or layoff. Anyone rolled from his position, who had sufficient seniority, could either bid on a vacant job within the department or roll an employee with less seniority. If the person rolled had the least department seniority and no vacancies were available within the department, he would return to his original department with full seniority in that department.
 
 
 10
 Because the new seniority system, at its inception, was superimposed upon a segregated departmental structure, the system operated to perpetuate the effects of pre-Act discrimination by requiring that all black employees hired before 1965, who had previously been excluded from the higher paying white departments, bid into those departments on the basis of their plant-wide seniority but compete for jobs within the new department on the basis of their seniority in that department. A black department entrant who was rolled from the department went back to the lower paying Service Department, while a white department entrant with the same plant-wide seniority as the black was rolled back to his higher paying formerly all-white department. The immediate effect of the new seniority system was to maintain blacks in lower paying positions than whites with equivalent plant-wide seniority.
 
 
 11
 The Court finds, however, that the operation of the new seniority system, over time, has made it possible for blacks, hired under the segregated system existing before 1965, to obtain and hold positions within formerly all-white departments and thus obtain sufficient seniority in those departments to avoid a roll out. The result is that blacks and whites now hold positions within the Machine Operator's Department, the Service Department, and the Tool Room (Ex. # 2). There is no evidence in the record relating to the composition of the Maintenance Department. Further, the seniority system as established and maintained since 1965 has operated to place every employee, black or white, hired since 1965 on an equal footing in terms of ability to compete for and hold jobs within the various departments. A disparity does remain, however, between the department seniority in formerly all-white departments of blacks and whites hired upon the same date but under the prior segregated system.
 
 
 12
 Though the plaintiff has remained in the service department since 1954, he has held the job of cut-off-saw operator since 1973. Since 1965 forty-eight employees have bid from the service department to the machine shop, and the district court found that 30 had remained in the machine shop. Of this thirty, 17 are black. Of these 30 who transferred from the service department to the machine shop and remained there, 24 have less plant-wide seniority than the plaintiff. The plaintiff has never attempted to bid out of the service department.
 
 C.
 
 13
 Referring to its findings that on the whole employees within the service department and the machine shop perform different job duties and that department seniority is a standard practice in heavy industry, the district court concluded that "there existed, free of discriminatory purpose, a rational basis for the continued separation of these departments for (intradepartmental seniority) purposes after 1965." This led to the further conclusion that "the present seniority system was established without any intent to discriminate on the part of the Company or union." In holding that the plaintiff had failed to establish a Title VII violation by either defendant the court stated:
 
 
 14
 Further, the Court concludes that the Company and Union have maintained and operated the seniority system free of any discriminatory purpose. Since this system was implemented, there has been no distinction made as to race in promotion or hiring. The system is operated to move blacks from the Service Department into formerly all-white departments. Likewise, the system has operated to hire all new employees into the formerly all-black Service Department. All promotions are obtained through bidding based upon plant-wide seniority. The end result has been an integration of all departments in a continuing equalization of blacks and whites seeking to bid into a new department.
 
 
 15
 It should be borne in mind that this is an individual action in which the plaintiff seeks promotion or pay equalization, back pay and attorney fees. Based upon the conclusions (a) that the present seniority system was not established with an intent to discriminate and (b) that the system has been maintained and operated free of discriminatory purpose, the Court further concludes that the present seniority system is bona fide and that the defendants by establishing and maintaining the system have not violated 42 USC §§ 2000e et seq. See Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).
 
 
 16
 The district court also noted the plaintiff's failure to bid for any of the openings in departments other than the service department and stated, "Applying for a job or bidding for a promotion is normally a prerequisite to the maintenance of an individual action for discrimination for failure to receive the job or promotion."
 
 II.
 
 17
 The plaintiff argues that the seniority system of Mueller Co. had its "genesis" in racial discrimination. This follows, he maintains, because there was and is no rational basis for separating the service department and the machine operator's department. This is shown by the fact that the employees of the two departments work side by side under one roof and are supervised by the same foremen. Further proof of the discriminatory origin of the departmental system is the fact that prior to 1965 three of the departments were all white and one was all black. Yet there was one "anomalous" position in each department which was assigned to that department solely because of the race of the persons who had occupied it prior to 1965.
 
 
 18
 The defendants respond that the seniority system has always been facially neutral. Prior to 1965 no employee, white or black, was permitted to transfer from one department to another. Since that date all employees have been permitted to bid for jobs in all four departments and many black employees have successfully bid out of the service department. Upon transferring, a person in plaintiff's position may find himself in a lower position on the new departmental list than some employees of that department who have lower plant-wide or company seniority. However, this disadvantage to the plaintiff arises from the pre-1965 practice of assigning all black employees to the service department, not from the fact that the seniority system requires all employees to assume a new position at the bottom of the departmental list upon making an inter-departmental transfer. The defendants argue that the district court's findings that employees in different departments perform generally different duties is not clearly erroneous. This finding, together with the finding that departmental seniority is usually adhered to in heavy industry (there is no dispute that Mueller Co. is "heavy industry") supports the conclusion that the seniority system in question is bona fide. The fact that Mueller Co. practiced racial discrimination at the time the system of departmental seniority was adopted does not mean that system had its genesis in a racially discriminatory purpose. Until 1965 this system froze each employee white as well as black into a single line of progression. One effect was to freeze black employees into the lower paying jobs in the machine division.
 
 
 19
 The defendants also contend that the plaintiff's failure to apply for any of more than 40 openings in the machine operator's department since 1968 bars recovery in this action. The record demonstrates that all openings in that department since the transfer rule was changed have been filled on a non-racial basis using company seniority. The plaintiff had no reasonable fear that a loss of employment would result from his transferring. If he were "bumped" from his new job or laid off for reduction of forces there he had the right to roll back to the service department on the basis of his company seniority. The plaintiff has not responded to this argument other than to assert that he did not want the instability of being rolled back and forth from one department to another.
 
 III.
 
 20
 Though Title VII proscribes all racial discrimination in employment practices, § 703(h), 42 U.S.C. § 2000e-2(h), permits an employer to establish different employment standards pursuant to a bona fide seniority system.[1] This section was dealt with extensively by the Supreme Court in Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). The seniority system in Teamsters was similar in many respects to the one in effect at the Mueller Co. Benefits were calculated on the basis of company seniority, but seniority within the particular bargaining unit controlled for job bidding and other competitive purposes. It differed from the Mueller system in that upon transfer to a more desirable job in a different unit an employee was forced to forfeit all competitive seniority acquired in his previous unit and start at the bottom of the list in his new unit. This system "locked" all workers into the units where they began employment, but worked most strongly to the disadvantage of minority employees who had been denied the opportunity to acquire the better jobs at the time of hire. The system had the effect of perpetuating past discriminatory practices by discouraging minority employees from transferring to the more desirable jobs even after they were free to make such transfers. The "disincentive" was loss of competitive seniority which they had acquired in their previous units.
 
 
 21
 The Courts held that except for § 703(h) the seniority system under review in Teamsters would be illegal as a practice "fair in form, but discriminatory in operation" because it perpetuated the effects of prior discrimination. 431 U.S. at 349, 97 S.Ct. at 1861. The Court concluded, however, that Congress intended to extend "a measure of immunity" to seniority systems which had this "freezing effect." Id. at 350, 97 S.Ct. at 1862. The Court rejected the argument that no seniority system which tends to perpetuate pre-Act discrimination can be bona fide:
 
 
 22
 Accordingly, we hold that an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination. Congress did not intend to make it illegal for employees with vested seniority rights to continue to exercise those rights, even at the expense of pre-Act discriminatees.
 
 
 23
 Id. at 353-54, 97 S.Ct. at 1864.
 
 
 24
 In concluding that the seniority system in Teamsters was "entirely bona fide," the Court noted a number of its features: it applied equally to all races; to the extent it "locked" employees into less desirable jobs, it did so for all, though the overwhelming majority of those who were discouraged by the system were white; maintaining separate bargaining units was rational and in accord with industry practice. It was conceded by the plaintiffs that the system did not have its genesis in racial discrimination and that it was negotiated and maintained free of any discriminatory purpose. Since the seniority system was bona fide, employees who suffered only pre-Act discrimination were entitled to no relief. Id. at 355-56, 97 S.Ct. at 1864-65.
 
 
 25
 The Court also dealt with the failure of post-Act discriminatees to apply for one of the more desirable jobs after they were made available. Holding that failure of an incumbent employee to apply for such a job after July 2, 1965 was not "an inexorable bar to an award of retroactive seniority," the Court stated that such persons must be given an opportunity "to undertake their difficult task of proving that they should be treated as applicants." 431 U.S. at 364, 97 S.Ct. at 1869.
 
 
 26
 The Supreme Court also dealt with § 703(h) in California Brewers Assn. v. Bryant, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980), but that decision merely determined that certain provisions of a collective bargaining agreement constituted a seniority system. The case was remanded to give the plaintiff an opportunity to show that "the seniority system established by the Agreement is not 'bona fide' or that the differences in employment conditions that it has produced are 'the result of an intention to discriminate because of race.' " 444 U.S. at 610-11, 100 S.Ct. at 821-822.
 
 
 27
 In Alexander v. Aero Lodge No. 735, IAM, 565 F.2d 1364 (6th Cir. 1977), cert. denied, 436 U.S. 946, 98 S.Ct. 2849, 56 L.Ed.2d 787 (1978), this court considered a seniority system which had the effect of perpetuating past discriminatory policies and concluded that it came within the § 703(h) exception. In Alexander this court also held that a black employee who failed to apply for a promotion though he was aware of the bidding requirement was not subjected to discriminatory post-Act practices. 565 F.2d at 1384.
 
 
 28
 Other courts of appeals have written extensively on § 703(h). In James v. Stockham Valves & Fittings Co., 559 F.2d 310, 352 (5th Cir. 1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978), the court identified four factors which the Supreme Court had "focused" on in Teamsters:
 
 
 29
 1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;
 
 
 30
 2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);
 
 
 31
 3) whether the seniority system had its genesis in racial discrimination; and
 
 
 32
 4) whether the system was negotiated and has been maintained free from any illegal purpose.
 
 
 33
 Since James was tried before the Teamsters decision was announced, there was no finding by the district court on whether or not the seniority system was bona fide. In remanding the court of appeals directed the district court to examine carefully the negotiations which led to adoption of the seniority system and the employment practices which underlay those negotiations.
 
 
 34
 The Fifth Circuit has followed the procedures outlined in James in Fisher v. Proctor & Gamble Mfg. Co., 613 F.2d 527 (5th Cir. 1980), cert. denied, --- U.S. ----, 101 S.Ct. 929, 66 L.Ed.2d 845 (1981); Swint v. Pullman-Standard, 624 F.2d 525 (5th Cir. 1980), cert. granted, --- U.S. ----, 101 S.Ct. 1972, 68 L.Ed.2d 293 (1981); United States v. Georgia Power Co., 634 F.2d 929 (5th Cir. 1981), and Terrell v. United States Pipe & Foundry Co., 644 F.2d 1112 (5th Cir. 1981). The Fifth Circuit's analysis was explicitly applied in Sears v. Atchison, T. & S. F. Ry., No. 79-1995/97/98 (10th Cir., March 11, 1981), and was implicitly approved in Younger v. Glamorgan Pipe & Foundry Co., 21 E.P.D. P 30, 406 (W.D.Va.1979), aff'd per curiam, 621 F.2d 96 (4th Cir. 1980).
 
 IV.
 
 35
 Decision of cases involving § 703(h) rests on the facts related to the seniority system under scrutiny; a case by case analysis is required. See James, supra, 559 F.2d at 352. Examining the record before us we must conclude that the seniority system of the Mueller Co. is bona fide when tested by the criteria of Teamsters. There is no doubt that the system tends to perpetuate some of the effects of past discriminatory employment practices. But this fact alone is not enough. Teamsters, supra, 431 U.S. at 353-54, 97 S.Ct. at 1863-64. The system is, and always has been, facially neutral, and prior to 1965 it "locked" white as well as black employees. The fact that the black employees were locked into lower job classifications than their white fellow employees is not sufficient to deprive the system of its § 703(h) immunity.
 
 
 36
 The district court also found that the establishment of separate seniority units within the same bargaining unit is rational and that department seniority conforms with industry practice. The plaintiff argues that the maintenance of separate seniority units within the machine division is irrational and that the district court's finding of rationality is an "ultimate" finding not subject to the clearly erroneous rule. However, the district court based its finding (or conclusion) of rationality on a specific supporting finding of fact that "(e)ach department has at all times relevant to this lawsuit performed a separate function." This finding is supported by substantial evidence and is not clearly erroneous. We conclude that the district court did not err in finding that the seniority system is rational. Cf. Heard v. Mueller Company, 464 F.2d 190 (6th Cir. 1972).
 
 
 37
 The fact that the seniority system was adopted at a time when Mueller Co. practiced racial discrimination in its employment practices does not establish that the system had its genesis in racial discrimination. In Teamsters Justice Stewart wrote that decisions holding that seniority systems which had their genesis in racial discrimination are not bona fide "can be viewed as resting upon the proposition that a seniority system that perpetuates the effects of pre-Act discrimination cannot be bona fide if an intent to discriminate entered into its very adoption." 431 U.S. at 346 n. 28, 97 S.Ct. at 1860 n. 28. The evidence in the record does not establish that an intent to discriminate entered into the "very adoption" of the Mueller seniority system. One of its effects was to freeze Negroes into the low paying jobs of the service department. However, it was equally rigid in freezing white employees into their department of entry, and thus had an equally limiting effect on the mobility of all employees in the machine division. In light of the undisputed findings of fact by the district court the Teamsters reading of § 703(h) does not permit us to find that the seniority system is not bona fide on this basis. As stated above, there is no proof that any illegal purpose entered into the negotiation of the seniority system. The district court concluded that the seniority system has been maintained and operated without any intent to discriminate by either the employer or the union.
 
 
 38
 On the entire record we conclude that the district court properly applied controlling law to determine that § 703(h) precludes a finding that the plaintiff is entitled to relief for pre-Act discrimination of the Mueller Co. and I.A.M.
 
 
 39
 At oral argument the plaintiff contended that the existence of the two "anomalous" job classifications demonstrated that the seniority system has never been racially neutral. However, this is just one feature of the pre-Act practices considered by the district judge. It was part of the requirement that all black employees prior to 1965 be assigned to the service department. It is undisputed that the positions of cut-off-saw operator and tool crib attendant have been held by both black and white employees since 1965.
 
 
 40
 The judgment of the district court is affirmed.
 
 
 
 [1]
 703(h) provides in part:
 Notwithstanding any other provisions of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system ... provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex or national origin ....