878 F.2d 1235
 51 Fair Empl.Prac.Cas. 394,
50 Empl. Prac. Dec. P 39,104
George E. HARVEY, Sr., by his personal representative; John
H. BLANKENBAKER; Leslie B. Calvin; Mose A. Covington;
Alfred E. Lyons; Lonnie L. Moore; Victor Powell; William
A. Smith; Martin H. Tuggle; T.F. Vanwinkle; Earl O.
Walker; Green Junior Wallace; William H. Zanders; Homer
Jackson; Eugene E. Bunch; and James G. Bunch, all other
persons similarly situated, Plaintiffs-Appellants,
Ray E. Landrum, Plaintiff-Intervenor-Appellant,
v.
UNITED TRANSPORTATION UNION; Atchison, Topeka & Santa Fe
Railway Company, Defendants-Appellees.
 No. 86-2445.
 United States Court of Appeals,
Tenth Circuit.
 June 16, 1989.
Rehearing Denied Sept. 14, 1989.
 
 Gerrit H. Wormhoudt (John T. Conlee, Thomas D. Kitch, Gregory J. Stucky and Link Christin, of Fleeson, Gooing, Coulson & Kitch, Terry G. Paup, and Chester I. Lewis, of Lewis & Davis, on the briefs), Wichita, Kan., for plaintiffs-appellants.
 Norton N. Newborn, Cleveland, Ohio (E.L. Lee Kinch, Wichita, Kan., Pamela D. Walker, Little Rock, Ark., and Shelly J. Venick and Barbara J. Barr, The Atchison, Topeka & Santa Fe Ry. Co., Chicago, Ill., with him, on the brief), for defendants-appellees.
 Before LOGAN and MOORE, Circuit Judges, and BURCIAGA, District Judge.*
 LOGAN, Circuit Judge.
 
 
 1
 This appeal requires us to reexamine the bona fides of a seniority system previously addressed in Sears v. Atchison, T. & S.F. Ry., 454 F.Supp. 158 (D.Kan.1978) (Sears I ), aff'd in part and rev'd in part, 645 F.2d 1365 (10th Cir.1981) (Sears II ), cert. denied, 456 U.S. 964, 102 S.Ct. 2045, 72 L.Ed.2d 490 (1982). In Sears II, we held that the Atchison, Topeka & Santa Fe Railway Company's (Santa Fe) seniority system violated Title VII of the Civil Rights Act of 1964 (Title VII or the Act), Secs. 701-718, 42 U.S.C. Sec. 2000e to 2000e-17, because it perpetuated the effects of pre-Act discrimination and was adopted and maintained with an intent to discriminate. We also held that the United Transportation Union's (UTU) role in creating and maintaining the discriminatory system subjected it to liability under Title VII. The class receiving relief in Sears was composed of black males who at any time were employed by Santa Fe as train porters, also known as porter-brakemen, and who were employed by Santa Fe in any capacity after July 2, 1965, the effective date of Title VII.[1] Id. at 1368, 1370; Sears I, 454 F.Supp. at 160.
 
 
 2
 The class in the instant case initially was composed of black persons employed as chair car attendants any time after the effective date of Title VII and who never were train porters. Blankenbaker v. United Transp. Union, Nos. 82-1984 and 76-31-C6, slip op. at 2, 3 (D.Kan. June 9, 1986).[2] The class subsequently was modified to exclude blacks employed as chair car attendants on the Santa Fe after March 23, 1971. Id. at 55. The case was tried based on the stipulated facts in Sears, as well as documentary and testimonial evidence before the court. Id. at 4. After trial but before judgment, Santa Fe settled the plaintiffs' claims for back pay and attorneys' fees. Thus, all that remained for the court were the plaintiffs' claims for back pay against UTU, and for injunctive relief in the form of retroactive seniority against UTU and Santa Fe.
 
 
 3
 The district court held that Santa Fe discriminated against members of the class "in job assignment on the basis of race" after the effective date of Title VII until March 23, 1971. Id. at 55. The court then formulated standards under which individual plaintiffs could receive retroactive seniority. The parties do not appeal this ruling. The district court also held that the "craft seniority system for the craft of brakeman-switchman, as it was applied to the chair car attendant craft, was bona fide, and that defendant UTU is immunized from liability for assessment of back pay" by Sec. 703(h) of Title VII, 42 U.S.C. Sec. 2000e-2(h). Id. Plaintiffs appeal this holding.[3]
 
 
 4
 * Factual Background
 
 
 5
 UTU is an unincorporated labor organization formed by the merger of four labor unions on January 1, 1969. Since at least 1892, either the UTU or two of its predecessors, the Brotherhood of Railroad Trainmen (BRT) and the Order of Railway Conductors and Brakemen (ORC & B), have served as collective bargaining agents for brakemen, switchmen, and conductors on the Santa Fe. The Brotherhood of Sleeping Car Porters (BSCP) is an unincorporated labor organization certified in 1946 to represent train porters and chair car attendants on the Santa Fe. The BSCP, not a party to this litigation, merged in 1978 with a division of the Brotherhood of Railway, Airline and Steamship Clerks (BRAC).
 
 
 6
 During the time relevant to this appeal, the Santa Fe rail lines were divided into three "Grand Divisions" known as the Eastern, Western, and Coast Lines. The Eastern Lines operated in Illinois, Iowa, Missouri, Kansas, Oklahoma, Colorado, and New Mexico. The Western Lines operated in Kansas, Oklahoma, Texas, Louisiana, and New Mexico. The Coast Lines operated in New Mexico, Arizona, and California. Each line was subdivided into divisions. Until Santa Fe's rail passenger service was taken over by Amtrak in May 1974, Santa Fe operated both passenger and freight trains on its lines.
 
 
 7
 The operating crew on a Santa Fe passenger train generally consisted of the conductor, train porter or head-end brakeman, rear-end brakeman, fireman, and engineer. The duties of brakemen, also known as road brakemen, included "the inspection of train cars, the testing and use of hand and light signals for the movement of trains, opening and closing of switches, coupling and uncoupling cars, hose and chain attachments, [and] reporting to and receiving instructions from the trainmaster and the conductor." Blankenbaker, slip op. at 10. Switchmen, also known as yard brakemen, performed essentially the same duties as road brakemen on passenger or freight trains, but worked regular hours and only within the yard. Train porters, a position created by Santa Fe in 1899, performed head-end braking duties on passenger trains in addition to servicing passengers and maintaining the interior of the cars. Chair car attendants, part of the nonoperating crew, were service personnel who attended to passengers' needs and cleaned the interior of the cars.
 
 
 8
 A new hire began to accumulate craft seniority within a seniority district on the earliest date of continuous service on the Santa Fe in that particular craft within that particular district. An employee's seniority date is critical because it "determines promotional opportunities as well as his right to protect work within his craft and district." Sears II, 645 F.2d at 1369. The first known agreement creating seniority rights on the Santa Fe was in 1892 between Santa Fe and predecessors of the UTU. Until the formation of the UTU in 1969, the BRT represented brakemen and switchmen, and the ORC & B or a predecessor represented conductors on the Santa Fe. From at least 1938 to 1960, only whites could join the BRT. Blankenbaker, slip op. at 13-14. The ORC & B also limited its membership to whites from at least 1934 to 1966. Id. at 14.
 
 
 9
 During the time period covered by this suit, the entry level position for whites on the Santa Fe was either as a brakeman or switchman. With few exceptions,[4] until the mid- or late-1960s all brakemen and switchmen on the Santa Fe were white. Before dualization of the brakemen's and switchmen's rosters, see post at pp. 1240-41, a new hire began working off the "extra-board" for the craft in which he was hired.[5] After accumulating sufficient seniority, a brakeman, for example, could "bid" for a regular run on a freight or passenger train.[6] After meeting certain requirements, including years of freight service and/or mileage, brakemen were promoted to conductor, but continued to accumulate brakeman seniority as well as seniority on the separate conductors' roster. Sears II, 645 F.2d at 1376; Sears I, 454 F.Supp. at 166, 179; VI R. 923-26; VII R. 1117, 1120; VIII R. 1242-43; VIII R. 1253-54; IX R. 1432-33. Similarly, the line of progression in the yard was from switchman to engine foreman, also known as yard conductor. E.g., VII R. 1117, 1120. We assume that a newly promoted engine foreman continued to accumulate seniority on the switchmen's roster.
 
 
 10
 Traditionally, the entry level position for blacks on the Santa Fe was as a chair car attendant, although some blacks were hired directly as train porters. Until 1959, chair car attendants on the Santa Fe could be promoted to train porters after meeting certain requirements. A newly promoted train porter could continue to work and accumulate seniority as a chair car attendant and bid on the train porter's extra-board until he had sufficient train porter seniority to obtain a regular position. All train porters were black and members of the chair car attendant craft were exclusively black until the 1960s when Santa Fe began hiring whites, usually college students, as temporary help during holidays and the summers. See, e.g., III R. 66-67, 119; (white chair car attendants first hired in 1967 or 1968); III R. 153-54 (first hired in 1968 or 1969); VI R. 848-50 (first hired in 1959 or 1960).
 
 
 11
 Santa Fe's creation of the train porter craft[7] to perform head-end braking duties in addition to a service function led to numerous clashes with the brakemen's collective bargaining representative, the BRT. The use of train porters to perform braking duties was beneficial to Santa Fe because train porters were paid less than their white counterparts, Sears II, 645 F.2d at 1369; Blankenbaker, slip op. at 12, and performed passenger service functions that "would be distasteful" to the white brakemen, Sears I, 454 F.Supp. at 168. After World War I,[8] the BRT made several efforts to obtain for its own members braking work performed by black train porters.[9] These efforts included "letter requests, demands, legislative lobbying, proceedings before the Train Service Board of Adjustment, the National Railroad Adjustment Board, First Division" (Board), and were the subject of federal court actions. Sears I, 454 F.Supp. at 167, cited in Blankenbaker, slip op. at 14. In 1939, the BRT filed a protest with the Board concerning Santa Fe's use of train porters to perform head-end braking duties. The Board upheld the protest in Award 6640 and ruled that these braking duties "should be performed by brakemen holding seniority as such on the Santa Fe brakemen's seniority roster." Id. at 168. Award 6640 was challenged in federal court based on lack of notice to the train porters of the proceedings.[10] Ultimately, the case was remanded to the Board. In Award 19324, issued on October 14, 1959, the Board ruled that train porters with seniority dates prior to April 20, 1942, the date of Award 6640, could continue to perform braking duties on the Santa Fe. Those train porters with seniority dates after April 20, 1942, were demoted to the position of chair car attendant. None of the plaintiffs in the instant case ever served as train porters on the Santa Fe.
 
 
 12
 The district court found that although the brakemen and switchmen "craft functions and duties were the same," there was a historical demarcation between road (brakemen) and yard (switchmen) work evidenced by these crafts' separate seniority rosters. Blankenbaker, slip op. at 15. As the level of yard work began to decrease, switchmen sought to obtain rights as brakemen. Beginning in 1959 and continuing through the early 1970s, the separate seniority rosters for brakemen and switchmen were dualized on sections of the Santa Fe. Id. at 16. Dualization involved placing the yard roster under the road roster and vice versa (called "topping and bottoming"), so that the most senior brakeman would be placed on the switchmen's roster under the most junior switchman, but the brakeman would retain his seniority on the brakemen's roster. Id. at 15-16. Likewise, the most senior switchman would become the most junior brakeman. Id. Some dualizations were one-way; the switchmen's roster would be placed under the brakemen, but the brakemen would have no corresponding rights to switchmen seniority. See VI R. 889. Although the railroad industry is almost completely dualized, there still are some brakemen's and switchmen's rosters on the Santa Fe that remain distinct. VI R. 893.
 
 
 13
 On February 7, 1965, Santa Fe and other carriers reached an agreement, commonly referred to as the "Feb. 7" agreement or protection, with five unions, not including the BSCP, BRT, or ORC & B. The BSCP and Santa Fe agreed in 1966 to extend Feb. 7 protection to chair car attendants. In general, this agreement guaranteed qualified chair car attendants a certain level of income if the employee was furloughed or worked in a job that paid less than the guaranteed amount. Feb. 7 protection, along with accumulated chair car seniority, would be forfeited if the chair car attendant voluntarily became a brakeman or switchman and assumed his place at the bottom of the appropriate seniority roster. See, e.g., Sears I, 454 F.Supp. at 169-70; V R. 746; Plaintiffs' Trial Exh. BH, contained in Addendum to Brief of Appellant, vol. II, tab A-20.
 
 
 14
 As employment opportunities for blacks on the Santa Fe expanded in the late 1960s, the BSCP sought to obtain an agreement with Santa Fe whereby its members could transfer into better paying jobs with promotional opportunities without losing their Feb. 7 protection or accumulated chair car seniority. On March 23, 1971, the BSCP and Santa Fe executed a "Cross-Craft" agreement, which, somewhat like the brakemen/switchmen dualizations, permitted chair car attendants to transfer to other crafts, including braking and switching, without losing their Feb. 7 protection or accumulated seniority. Thus, while a transferring chair car attendant could not carry over or "dove-tail" his chair car seniority into the new craft and would start as a new hire on that craft's seniority roster regardless of his years as a chair car attendant, he could continue to work as a chair car attendant or receive Feb. 7 payments until he had sufficient seniority to obtain regular work in his new craft.
 
 
 15
 In 1976, in an effort to eliminate the lingering effects of past discrimination, Santa Fe, along with other carriers, signed a Seniority Modification Agreement entered into by the National Carriers' Conference Committee and various unions.[11] Blankenbaker, slip op. at 23; V R. 729-30; VIII R. 1162-65. This agreement allowed certain female and minority employees who transferred into crafts represented by signatory unions to carry over previously accumulated seniority into their new craft and retain their seniority in the old craft. Blankenbaker, slip op. at 23-24. UTU was not a signatory union. Thus, chair car attendants who transferred to the brakemen's or switchmen's rosters could not carry over previously accumulated seniority.
 
 II
 Seniority System
 
 16
 Section 703(a), (c) of Title VII, 42 U.S.C. Sec. 2000e-2(a), (c), provides in relevant part:
 
 
 17
 "(a) It shall be an unlawful employment practice for an employer--
 
 
 18
 (1) to fail or refuse to hire ... any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ...; or
 
 
 19
 (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race....
 
 
 20
 ....
 
 
 21
 (c) It shall be an unlawful employment practice for a labor organization--
 
 
 22
 (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race ...;
 
 
 23
 (2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race ...; or
 
 
 24
 (3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section."
 
 
 25
 This section prohibits practices or procedures, even if neutral, that "operate to 'freeze' the status quo of prior discriminatory employment practices." Griggs v. Duke Power Co., 401 U.S. 424, 430, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). Thus, practices or procedures "that are fair in form, but discriminatory in operation," id. at 431, 91 S.Ct. at 853, violate Title VII even in the absence of an intent to discriminate, because "Congress directed the thrust of the Act to the consequences of employment practices, not simply the motivation." Id. at 432, 91 S.Ct. at 854 (emphasis in original).
 
 
 26
 Seniority systems that operate to "lock in" the effects of pre-Act discrimination would seem to fall under the Griggs "disparate impact" rationale were it not for Sec. 703(h) and its subsequent interpretation by the Supreme Court. That section provides that
 
 
 27
 "it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority ... system, ... provided that such differences are not the result of an intention to discriminate because of race."
 
 
 28
 42 U.S.C. Sec. 2000e-2(h). The Supreme Court has held that because of this section "an otherwise neutral, legitimate seniority system does not become unlawful under Title VII simply because it may perpetuate pre-Act discrimination." International Bhd. of Teamsters v. United States, 431 U.S. 324, 353-54, 97 S.Ct. 1843, 1864, 52 L.Ed.2d 396 (1977).[12] Thus, "the fact that a seniority system has a discriminatory impact is not alone sufficient to invalidate the system; actual intent to discriminate must be proved." American Tobacco Co. v. Patterson, 456 U.S. 63, 65, 102 S.Ct. 1534, 1535, 71 L.Ed.2d 748 (1982); see also Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 82, 97 S.Ct. 2264, 2275-76, 53 L.Ed.2d 113 (1977) ("absent a discriminatory purpose, the operation of a seniority system cannot be an unlawful employment practice even if the system has some discriminatory consequences").
 
 
 29
 Although the Supreme Court has not provided specific guidelines by which lower courts should evaluate seniority systems, the Fifth Circuit has distilled the following four factors from the Teamsters case:
 
 
 30
 "(1) whether the seniority system operates to discourage all employees equally from transferring between seniority units;
 
 
 31
 (2) whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice);
 
 
 32
 (3) whether the seniority system had its genesis in racial discrimination; and
 
 
 33
 (4) whether the system was negotiated and has been maintained free from any illegal purpose."
 
 
 34
 James v. Stockham Valves & Fittings Co., 559 F.2d 310, 352 (5th Cir.1977), cert. denied, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978); see Teamsters, 431 U.S. at 355-56, 97 S.Ct. at 1864-65. We previously have approved use of the Stockham Valves factors to guide the district court's inquiry under Sec. 703(h). See Firefighters Inc. for Racial Equality v. Bach, 731 F.2d 664, 668 (10th Cir.1984); Sears II, 645 F.2d at 1372 & n. 5. The district court here applied the Stockham Valves factors to the facts and concluded that "the creation and maintenance of a separate seniority system for the chair car attendant craft was based on legitimate business reasons." Blankenbaker, slip op. at 38.
 
 
 35
 Plaintiffs attack this holding on two separate grounds. First, they claim that principles of collateral estoppel preclude the trial court from holding bona fide here the seniority system found illegal in Sears. Second, plaintiffs argue that the trial court applied erroneous legal standards in examining the seniority system. We will address these contentions in turn.
 
 
 36
 Collateral estoppel, or issue preclusion, is a judge-made rule that prevents relitigation of issues "actually and necessarily determined" in a prior suit on a different claim, which involved a party to the subsequent litigation. Montana v. United States, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); see also Lombard v. Axtens (In re Lombard), 739 F.2d 499, 502 (10th Cir.1984); Restatement (Second) of Judgments, Secs. 27, 29 (1982). Here, plaintiffs assert that defendants are precluded by our decision in Sears II from contending that the seniority system is bona fide. We hold that plaintiffs waived this issue preclusion claim by failing to invoke it timely.
 
 
 37
 The issue preclusion claim never was raised formally until May 15, 1986, in Plaintiffs' Supplemental Memorandum in Support of Their Proposed Findings of Fact and Conclusions of Law, I R. tab 268, at 2-3. This memorandum was filed with the court approximately one year and four months after the trial and less than one month before the district court issued its opinion. This simply is too late. Although the use of issue preclusion by plaintiffs[13] is not subject to Fed.R.Civ.P. 8(c),[14] the rationale for requiring a party to plead defensive issue preclusion pretrial applies to offensive use as well[15]--to provide "the opposing party notice of the plea of estoppel and a chance to argue, if he can, why the imposition of an estoppel would be inappropriate." Blonder-Tongue Laboratories, Inc. v. University of Ill. Found., 402 U.S. 313, 350, 91 S.Ct. 1434, 1453, 28 L.Ed.2d 788 (1971) (defendant asserted issue preclusion); see Southern Pac. Communications Co. v. American Tel. & Tel. Co., 740 F.2d 1011, 1018 (D.C.Cir.1984) (plaintiff asserted issue preclusion). Although this notice requirement was established in a case approving defensive use of issue preclusion, it has even more force for offensive use, when, as here, plaintiffs seek to benefit from litigation to which they were not parties. See Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329-31, 99 S.Ct. 645, 650-52, 58 L.Ed.2d 552 (1979); Jack Faucett Assocs., Inc. v. American Tel. & Tel. Co., 744 F.2d 118, 124-25 (D.C.Cir.1984), cert. denied, 469 U.S. 1196, 105 S.Ct. 980, 83 L.Ed.2d 982 (1985). Moreover, allowing issue preclusion claims to be raised post-trial does nothing to vindicate two primary policies behind the doctrine, conserving judicial resources and protecting parties from "the expense and vexation" of relitigating issues that another party previously has litigated and lost. Montana, 440 U.S. at 153-54, 99 S.Ct. at 973-74; see also Parklane Hosiery, 439 U.S. at 326, 99 S.Ct. at 649.
 
 
 38
 Plaintiffs direct our attention to the pretrial conference order where they contend the issue of collateral estoppel was raised. II R. tab 105. Careful review of this document, which does not specifically mention issue preclusion or collateral estoppel, and the entire trial record establishes that the plaintiffs intended to rely on our finding in Sears II, not for its preclusive effect, but as precedential authority and as a reference point for the present case. In addition, because the basic function of issue preclusion is to "take[ ] the place of evidence" at trial, R. Casad, Res Judicata 267 (1976), plaintiffs' trial conduct reveals a willingness to try the bona fides of Santa Fe's seniority system and a lack of reliance on the preclusive force of Sears II.
 
 
 39
 On the merits, plaintiffs contend that the district court based its Sec. 703(h) determination on erroneous legal standards. Specifically, plaintiffs complain that the court misapplied the Stockham Valves factors to its factual findings. Whether a seniority system reflects an illegal intent to discriminate is a "pure question of fact" that we review under the clearly erroneous standard of Fed.R.Civ.P. 52(a). Pullman-Standard v. Swint, 456 U.S. 273, 287-88, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982); Anderson v. City of Bessemer City, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (factfinding clearly erroneous when reviewing court, based on entire record, has "definite and firm conviction that a mistake has been committed") (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Whether the district court failed to consider or accord proper weight or significance to relevant evidence are questions of law we review de novo. See Swint, 456 U.S. at 291, 292, 102 S.Ct. at 1791, 1792; United States v. Georgia Power Co. (Georgia Power II), 695 F.2d 890, 892 (5th Cir. Unit B 1983). Even when we discern such errors of law, however, "a remand is the proper course unless the record permits only one resolution of the factual issue." Swint, 456 U.S. at 292, 102 S.Ct. at 1792.
 
 
 40
 We reverse and remand the district court's determination that the seniority system in issue was bona fide because we conclude the court made legal errors both in its application of the Stockham Valves factors and in its failure to consider relevant evidence. The key element of a bona fide seniority system under Sec. 703(h) is its lack of purposeful discrimination. See Gantlin v. West Va. Pulp & Paper Co., 734 F.2d 980, 990 (4th Cir.1984); Terrell v. United States Pipe & Foundry, 644 F.2d 1112, 1118 (5th Cir. Unit B 1981), vacated sub nom. on other grounds International Ass'n of Machinists & Aerospace Workers v. Terrell, 456 U.S. 955, 102 S.Ct. 2028, 72 L.Ed.2d 479 (1982); United States v. Georgia Power Co. (Georgia Power I), 634 F.2d 929, 934 (5th Cir. Unit B 1981), vacated sub nom. Local 84, Int'l Bhd. of Elec. Workers v. United States, 456 U.S. 952, 102 S.Ct. 2026, 72 L.Ed.2d 477 (1982), on remand, Georgia Power II, 695 F.2d 890 (affirming prior decision). In deciding whether purposeful discrimination exists, a court must examine the totality of circumstances surrounding the creation and operation of the seniority system. See, e.g., Teamsters, 431 U.S. at 345, 97 S.Ct. at 1859-60; Gantlin, 734 F.2d at 992. In particular, a finding of discriminatory intent can be based on indirect, circumstantial evidence including evidence of discriminatory impact, Swint, 456 U.S. at 289, 102 S.Ct. at 1790, and pre-Act discrimination, Evans, 431 U.S. at 558, 97 S.Ct. at 1889; Pitre v. Western Elec. Co., 843 F.2d 1262, 1267 (10th Cir.1988).
 
 
 41
 The district court concluded that the craft seniority system as applied to chair car attendants was bona fide because it "was based on legitimate business reasons," Blankenbaker, slip op. at 38, 51. The court's focus on legitimate business reasons pervades its analysis of each Stockham Valves factor. See, e.g., id. at 47. But a defendant's legitimate business reasons for adopting and maintaining a seniority system are relevant only insofar as they reflect the existence or lack of discriminatory intent. That rational business reasons could be forwarded to explain the adoption or operation of the system does not eliminate the possibility of purposeful discrimination. That the district court may have assumed to the contrary is one factor in our decision to remand of the case for further consideration.
 
 
 42
 Moreover, to the extent that the district court did focus on the presence or lack of discriminatory intent, it applied some incorrect legal standards and appears to have disregarded relevant evidence. In applying the first Stockham Valves factor,[16] the district court found that the "Santa Fe seniority system for brakemen-switchmen was equally applicable to all applicants regardless of race." Id. at 45. This finding appears to focus on facial neutrality. As we noted in Sears II, 645 F.2d at 1372-73, however, the Teamsters Court took this line of inquiry beyond facial neutrality by examining the seniority system's impact in practice. See 431 U.S. at 355-56, 97 S.Ct. at 1864-65. In Teamsters, blacks and Hispanics were hired only as city drivers or servicemen. The generally superior or "target" jobs were as line drivers. The Court found that "[t]he city drivers and servicemen who are discouraged from transferring to line-driver jobs are not all Negroes or Spanish-surnamed Americans; to the contrary, the overwhelming majority are white." Id. at 356, 97 S.Ct. at 1865. Thus, the Supreme Court examined the seniority system's effect on employees seeking transfers from the job classifications into which discriminatees were placed to the "target" jobs. Here, the craft into which discriminatees were placed was that of chair car attendant. The "target" job was that of brakeman/switchman. Unlike the situation in Teamsters, all chair car attendants discouraged from transferring to the more desirable jobs of brakemen/switchmen were black.
 
 
 43
 Apparently addressing this fact, the district court noted that Sears II involved a stipulation that the brakemen's and switchmen's rosters were dualized in 1960. Considering evidence presented at trial here, the district court found that this stipulation was factually incorrect. It then found because the brakemen's and switchmen's rosters were not completely dualized before 1971, "the Santa Fe seniority forfeiture rules on entry-level jobs have always worked to discourage not only black employees, but also white brakemen or switchmen from moving to another craft." Blankenbaker, slip op. at 43-44.
 
 
 44
 Although we do not question the district court's finding on this point and note that it is proper to examine the transfer policies of jobs other than those into which discriminatees were placed, this alone is not sufficient to support a finding of neutrality in operation. The inquiry must move beyond facial neutrality into disparate impact--does the system affect whites and blacks equally? See Swint, 456 U.S. at 289, 102 S.Ct. at 1790; Teamsters, 431 U.S. at 356, 97 S.Ct. at 1865 (seniority system bona fide in part because it applied "equally to all races"). An examination of the system's disparate impact is necessary because a facially neutral system simply may be a "mask for the gross inequality beneath." Georgia Power I, 634 F.2d at 935.
 
 
 45
 For instance, the district court did not comment upon, and thus appears not to have considered, the differences in pay and promotional opportunities available to the two groups. Switchmen essentially are brakemen in the yard, e.g., Blankenbaker, slip op. at 10, 15, are paid more than chair car attendants, e.g., III R. 249; IV R. 322, 357; VIII R. 1293, and are in a line of progression to engine foreman, e.g., VII R. 1117, 1120. Chair car attendants do not perform any braking duties, Blankenbaker, slip op. at 10, 50, are paid less than brakemen and switchmen, and after 1959 had no hope of promotion, Sears II, 645 F.2d at 1376; Blankenbaker, slip op. at 11, 14. Equating the seniority system's effect on chair car attendants with its effect on switchmen, who occupy a job that is as much a "target" job for attendants as road brakemen, is like finding that the system is neutral in operation because conductors would be deterred by loss of their conductor seniority from transferring to the chair car craft. That whites in other job classifications also are deterred from transferring may be evidence of the system's facial neutrality, but the all black composition of the most deterred craft--chair car attendant--is countervailing evidence of discrimination that the district court must consider.
 
 
 46
 On remand, the district court should consider the chair car attendant craft's racial composition and evidence of the seniority system's disparate impact. See Gantlin, 734 F.2d at 990-91 & n. 17 ("under some circumstances it is permissible to infer that a racially discriminatory motive exists if a seniority system's predominant effect is to confine blacks to lower-paying, menial jobs") (citing Georgia Power I ); Terrell, 644 F.2d at 1119 (reversal of finding of bona fideness in part because district court erred in not considering seniority system's disparate impact); Georgia Power I, 634 F.2d at 935 (same). Although evidence of disparate impact alone is not sufficient to invalidate a seniority system under Sec. 703(h), Swint, 456 U.S. at 277, 102 S.Ct. at 1784; Patterson, 456 U.S. at 65, 102 S.Ct. at 1535-36, it may be highly probative evidence of a defendant's purposeful discrimination. See, e.g., Swint, 456 U.S. at 289, 102 S.Ct. at 1790; Teamsters, 431 U.S. at 356, 97 S.Ct. at 1865 (Court considered racial composition of disadvantaged craft and effect of system on that craft); Sears II, 645 F.2d at 1372-73 (same); Terrell, 644 F.2d at 1119, vacated sub nom. International Ass'n of Machinists & Aerospace Workers v. Terrell, 456 U.S. 955, 102 S.Ct. 2028, 72 L.Ed.2d 479 (1982), on remand, 696 F.2d 1132, 1134 (5th Cir. Unit B 1983) (per curiam) (remanded to trial court to consider "the disparate impact of the ... seniority system on black employees") (footnote omitted); Georgia Power I, 634 F.2d at 935 ("seniority system here did not operate equally on the races but had a disproportionately heavy negative impact on blacks."); cf. Taylor v. Mueller Co., 660 F.2d 1116, 1122-23 (6th Cir.1981).
 
 
 47
 As to the second Stockham Valves factor,[17] the district court found that "legitimate business reasons" justified "the craft and seniority distinction preserved between chair car attendants on the one hand and operating employees, such as brakemen and switchmen on the other," and that such distinctions were "rationally based upon functions and duties of [the] respective crafts and in accord with industry pracrtices [sic]."[18] Blankenbaker, slip op. at 47. Aside from the district court's undue reliance on legitimate business reasons, see ante p. 1244, it also failed to consider whether the separation of collective bargaining representatives was rational or based on racial considerations.
 
 
 48
 The BRT, the bargaining representative for brakemen/switchmen, limited its membership to whites until 1960. Blankenbaker, slip op. at 13-14. There may be a nonracial explanation for the separation of chair car attendants and brakemen/switchmen into separate bargaining units, but there may be no reason in fact for their separate representation other than that one union prohibited black members. See Gantlin, 734 F.2d at 989 (bona fide seniority system "bargained for by a unit representing both black and white employees"). For instance, the BRT represented dining car stewards, a nonoperational craft that for many decades was exclusively white and whose duties are analogous to those of chair car attendants. IX R. 1439; III R. 11; III R. 48; III R. 139.[19] Although the district court's inquiry, the rationality of the separate crafts of chair car attendant and brakeman/switchman, certainly is a proper one, its formalistic application of this factor appears to have led it to impermissibly disregard evidence of possible discriminatory intent.
 
 
 49
 In analyzing the third Stockham Valves factor,[20] the district court found, contrary to its finding in Sears I, 454 F.Supp. at 179-80, that the seniority system did not have its genesis in racial discrimination. Blankenbaker, slip op. at 47-49. In Sears II, we stated that a seniority system has its genesis in racial discrimination if it is created when discrimination is the " 'standard operating procedure' " of the employer. 645 F.2d at 1378 (quoting Sears I, 454 F.Supp. at 180); accord Larkin v. Pullman-Standard Div., 854 F.2d 1549, 1577 (11th Cir.1988); Terrell, 644 F.2d at 1118; Georgia Power I, 634 F.2d at 936. We recognize that this is a narrower view than that taken by some other courts, see Gantlin, 734 F.2d at 989; Taylor, 660 F.2d at 1122-23. The approach of Gantlin and Taylor, which would discount evidence of the employer's racially discriminatory practices at the time a seniority system was adopted, actually has the effect of excluding potentially relevant evidence, the error for which we are reversing the district court here. Our narrower approach, in contrast, does not foreclose consideration of other circumstances surrounding the creation of the particular seniority system. A seniority system's genesis in a racially discriminatory environment is only one factor in analyzing whether the system is bona fide, i.e. adopted and maintained without an intent to discriminate. Consideration of all the surrounding circumstances may lead the court to conclude that the creation and maintenance of the system was nondiscriminatory even if it arose out of, or had its "genesis" in, a discriminatory environment.
 
 
 50
 Under Sears II, then, application of the "genesis" factor entails an examination of the conditions out of which the seniority system arose to determine if those conditions include racially discriminatory practices by the employer. If so, the seniority system has its genesis in racial discrimination. Here, the district court did not have before it any evidence contrary to its own finding in Sears I that the seniority system in question was created when "segregation was standard operating procedure on the Santa Fe." 454 F.Supp. at 180. Thus, the district court's finding that the seniority system at issue did not have its genesis in racial discrimination, which resulted from a misapplication of Sears II, is clearly erroneous.
 
 
 51
 In reaching its conclusion, the district court focused on two facts, both of which it firmly rejected in Sears I as a basis for finding the system bona fide. See 454 F.Supp. at 179. First, the district court noted that the first known collective bargaining agreement with seniority provisions between brakemen/switchmen and Santa Fe was executed in 1892, seven years before the creation of the train porter craft. Blankenbaker, slip op. at 48. Based on this fact, the court found "that the origin in establishing different crafts and seniority systems in the railroad industry generally was not motivated by racial animus." Id. Next, the district court found that historical evidence adduced at trial demonstrated that the "organization of the brakemen/switchmen craft and its seniority system was a direct countervailing response to protect its members against favoritism and nepotism in personnel management." Id. at 49. Neither of these findings affects the conclusion that the seniority system had its genesis in racial discrimination; rather, they merely support the district court's finding that the separate craft and seniority systems for chair car attendants and brakemen/switchmen were rational.
 
 
 52
 In its discussion of the fourth Stockham Valves factor,[21] the district court never expressly stated whether the brakemen/switchmen seniority system had been maintained or negotiated with the intent to discriminate. The court only noted that, unlike Sears, the plaintiffs here never had performed braking duties and there was no evidence that the BRT had ever sought to obtain chair car work for its own members or to force Santa Fe to fire the black attendants. Id. at 50.
 
 
 53
 First, we note that in finding in Sears I that Santa Fe's seniority system was negotiated and maintained with illegal purpose, the district court made the following observations:
 
 
 54
 "The seniority system was created by collective bargaining at a time when there were no black brakemen and no white train porters, at a time when blacks as a class performed only the most menial tasks on the railroad.... The unions which maintained the seniority system through negotiations and collective bargaining with the Santa Fe had clauses in their Constitutions which limited membership to white males.... Since blacks were not eligible for membership in the unions, they could not be employed as brakemen or conductors, and they could not be eligible for the economic protection of the seniority systems in question.... The seniority system was used by the unions to deprive blacks of their train porter positions."
 
 
 55
 454 F.Supp. at 180. We upheld this finding on review because the BRT had used the seniority system as a weapon against blacks on the Santa Fe by actively seeking to transfer braking duties to its white-only membership. Sears II, 645 F.2d at 1374. None of these facts have changed, and the district court identified no additional facts that would justify a contrary result. Instead, focusing on the differences between the present class and that in Sears, the court found "no evidence that the seniority system for brakemen and switchmen was negotiated and maintained for the purpose to banish the employment of black chair car attendants from such craft position on Santa Fe, nor is there any evidence that BRT also made such a demand in its protest for braking duties before the [Board] in 1939," which resulted in Award 19324. Blankenbaker, slip op. at 50.
 
 
 56
 This finding appears to be based on an argument we rejected in Sears II. In attempting to avoid liability in Sears II, the UTU contended that its efforts culminating in Award 19324 "were simply 'lawful resort' to administrative agencies to regain the disputed head-end braking duties," and that there was no evidence that " 'UTU demanded that blacks be hired only as Chair Car Attendants or Train Porters.' " 645 F.2d at 1375 (citation omitted). We rejected this contention because the "net effect of UTU's actions was that it gained control of most braking work, and it allocated the work to its white members only." Id.
 
 
 57
 The district court's finding that the BRT did not seek to acquire chair car work for its own members or force Santa Fe not to hire blacks is not clearly erroneous, but is not dispositive of the fourth Stockham Valves factor. That the BRT did not seek to prevent blacks from working as chair car attendants does not mean that the seniority system was negotiated and maintained with no intent to discriminate and does not change the effect of Award 19324 on blacks working on the Santa Fe. The import of our review in Sears II of the circumstances surrounding Award 19324 was that it was an example of the intentionally discriminatory use of the seniority system.[22] See id. at 1369, 1374, 1375. This example of discrimination is highly relevant in this case even though the class here has never performed braking duties. As in Sears II, the practical result of Award 19324 was that, through the efforts of the BRT, blacks on the Santa Fe were denied the one promotional opportunity they enjoyed. See id. at 1376; Blankenbaker, slip op. at 10, 14. Since 1956, no blacks on the Santa Fe have been promoted from chair car attendant to train porter, id. at 14, and, with few exceptions, no blacks with seniority dates after April 20, 1942, formally performed braking or switching duties until after the passage of Title VII, thus making them ineligible for promotion to conductor or engine foreman. In sum, the effect of Award 19324 was that, until the late 1960s and early 1970s when Santa Fe began hiring blacks in positions that were part of promotional lines of progression, a black hired on the Santa Fe would begin his career as a chair car attendant and end it as a chair car attendant.[23] On remand, the district court should consider this discriminatory use of Santa Fe's seniority system in making its ultimate finding under Sec. 703(h).
 
 
 58
 Quite apart from our concerns with the substance of its inquiry, the district court's failure to consider other relevant evidence under this fourth Stockham Valves factor is reversible error. For instance, there was evidence in this record from which the district court could find demonstrable manipulation of or deviation from the seniority system, which is particularly strong evidence of the operation or maintenance of the system with an intent to discriminate. See, e.g., Wattleton v. International Bhd. of Boiler Makers, 686 F.2d 586, 590-91 (7th Cir.1982) (only whites were successful in transferring based on plant seniority to jobs under defendant union's jurisdiction), cert. denied, 459 U.S. 1208, 103 S.Ct. 1199, 75 L.Ed.2d 442 (1983); Scarlett v. Seaboard C. L. R.R., 676 F.2d 1043, 1051-52 (5th Cir. Unit B 1982) (Sec. 703(h) not available to defendants, including UTU, because of consistent disregard of seniority-based promotional rules when applied to blacks). For example, in the Silsbee, Texas, Seniority District, the only place where Santa Fe hired blacks as brakemen in any numbers before 1965, see ante n. 4, there were no black conductors before the effective date of Title VII, although promotion to conductor was mandatory for white brakemen to remain on the Santa Fe. Sears I, 454 F.Supp. at 166 n. 9, 172; Plaintiffs' Trial Exh. BR, Response of Defendant UTU to Plaintiffs' Request for Admissions, Stipulation of Facts, exh. C at 21, contained in Addendum to Brief of Appellant, vol. I, tab A-1 [hereinafter Plaintiffs' Trial Exh. BR]. Apparently, the BRT and Santa Fe's seniority based promotional rules for white brakemen were not applied to black brakemen in the Silsbee district. Although no member of the plaintiff class was employed in that district, the treatment of these black brakemen may be evidence of the manipulation of the seniority system with the intent to discriminate.
 
 
 59
 UTU's failure to execute the 1976 Seniority Modification Agreement also may be evidence of maintenance of the seniority system with an intent to discriminate. The district court found that UTU's "endorsement" of this agreement was not necessary to make it effective. Blankenbaker, slip op. at 24. This finding has no support in the record and is clearly erroneous. The testimony cited by the district court reveals that these witnesses were discussing the 1971 "Cross-Craft" agreement. See VI R. 803-10, and VI R. 914-15, cited in Blankenbaker, slip op. at 24. Other testimony cited by the court actually indicates that UTU's signature was necessary for the agreement to become effective as to the brakemen's and switchmen's rosters. V R. 732, cited in Blankenbaker, slip op. at 24; see also VIII R. 1308-09. On remand the district court should consider this discriminatory use of Santa Fe's seniority system in making its ultimate finding under Sec. 703(h).
 
 
 60
 Finally, the district court did not discuss whether the partial dualization of the brakemen's and switchmen's seniority rosters was evidence of an intent to discriminate. The dualization effort was in response to the concerns of white switchmen about declining yard work. VI R. 887-88; VII R. 1065-68. Dualization did not occur at all in those areas where it was opposed by switchmen, VII R. 1080, and was only one-way where brakemen were not interested in reciprocal rights, id. at 1074-75, 1076. The effect of the dualization of some brakemen's and switchmen's seniority rosters was to dilute the seniority of blacks newly hired or transferred into the brakeman craft. See IV R. 378-79. If this effect was intentional, it would be strong evidence of manipulation of the seniority system with an intent to discriminate.
 
 
 61
 The district court discussed only the four Stockham Valves factors in deciding that the seniority system was bona fide. But these factors are not talismanic indicators of intent; instead, they serve as a partial means to an end, not the end itself. See Gantlin, 734 F.2d at 990 (factors are "non-exclusive list to aid in the determination of whether a given seniority system is bona fide"). A district court cannot mechanically tally the factors and determine a winner. Cf. Georgia Power I, 634 F.2d at 935 (court declined to decide whether a "seniority system may be found non-bona fide on the basis of only one of the four" Stockham Valves factors) (citing Sears I, 454 F.Supp. at 179). The Supreme Court was careful in Swint to note that the passage in Teamsters upon which the Stockham Valves factors were based was "not meant to be an exhaustive list of all the factors that a district court might or should consider in making a finding of discriminatory intent."[24] 456 U.S. at 279 n. 8, 102 S.Ct. at 1785 n. 8; see also Terrell, 644 F.2d at 1119; Pettway v. American Cast Iron Pipe Co., 576 F.2d 1157, 1192 (5th Cir.1978), cert. denied, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). Exclusive reliance on the Stockham Valves factors may lead a court, as here, to disregard or discount relevant evidence. The district court must consider the totality of the circumstances and any evidence, direct or circumstantial, that bears on the motives of the defendants, whether or not such evidence is relevant to any of the Stockham Valves factors. See Terrell, 644 F.2d at 1119 (district court's failure to consider additional factors resulted in reversal).
 
 
 62
 We must remand because our careful review of the record shows that although the district court purported to consider the "totality of the evidence," Blankenbaker, slip op. at 51, it failed to consider at least three factors, which do not directly bear on any of the Stockham Valves factors, but which might have led to a finding that the seniority system was nonbona fide. First, the district court did not appear to consider or give any weight to our decision in Sears that Santa Fe's seniority system was not bona fide. Although our determination in Sears II does not have preclusive effect here, see ante at pp. 1243-1244, and, as the district court noted, there are significant differences between the plaintiff classes in the respective cases, our finding that the seniority system created "employment differences with the intention of discriminating because of race," Sears II, 645 F.2d at 1374, has some independent significance in the instant case.
 
 
 63
 Second, the district court did not consider whether the BRT's efforts in favor of full crew laws was evidence that it maintained the seniority system with an intent to discriminate. Full crew laws on the Coast Lines in Arizona and California, for example, required both freight and passenger trains to carry either two brakemen or a brakeman and fireman. Sears I, 454 F.Supp. at 163; Plaintiffs' Trial Exh. BR, exh. B at 3. Evidence in the record indicates that the BRT would not consent to inclusion in these statutes of porter-brakemen or train porters, along with brakemen, and took the position that these laws prohibited the use of persons not holding seniority on the brakemen's roster. See Beal v. Missouri Pac. R.R., 312 U.S. 45, 46-47, 61 S.Ct. 418, 419-20, 85 L.Ed. 577 (1941) (describing events in Nebraska where BRT filed complaint with state commission alleging that railroad violated full crew law by employing train porters instead of brakemen); IV R. 418; id. at 458-59, 462-63. These laws had the effect of preventing blacks from serving as brakemen in those states because Santa Fe did not hire blacks as brakemen and the BRT did not allow black members. Sears I, 454 F.Supp. at 163; IV R. 418; id. at 459; Plaintiffs' Trial Exh. BR, exh. C at 22; see generally Plaintiffs' Trial Exh. AA at 52 ("[t]he hostility of the white trainmen toward the Negro has also been a major reason for the passage of many state 'full crew' laws"). Although the plaintiffs here never performed any braking duties, the district court did not evaluate to what extent this was due to the BRT's white-only membership clause, its actions in obtaining Award 19324, and its actions in seeking full crew laws. Neither did the court review the inferences that might be drawn from collectively examining the BRT's aforementioned conduct. See Terrell, 644 F.2d at 1119-20 (district court erred in failing "to focus upon additional factors, such as the avowedly racist policies of the craft unions, and ... to recognize the cumulative effect of separate pieces of evidence of racial motives").
 
 
 64
 Finally, the district court erred in not considering Santa Fe's promotional structure within craft divisions and how the seniority system played a role in this structure. In Georgia Power I, the employer had assigned all blacks to the lowest job classifications. 634 F.2d at 931. These all-black jobs were placed into separate seniority units. Id. Like Santa Fe's seniority system, employees transferring into new seniority units could not carry over accumulated seniority, but seniority in the old unit was retained in the event of layoffs. Id. The court of appeals in Georgia Power I noted that
 
 
 65
 "[u]nlike other seniority units, which were part of lines of progression and through which an employee could advance as he accumulated seniority, the [all black] job classifications were not part of any line of progression. Thus, in order for blacks to advance to a better, higher-paying job, they had to forfeit their seniority."
 
 
 66
 Id. After examining the disparate impact of the employer's seniority system, whose seniority forfeiture rules "locked in" minority employees, the Fifth Circuit stated that the discriminatory effect of the seniority system "was compounded by the fact that blacks could not progress except by forfeiting their seniority." Id. at 935. Although white employees were "locked in" to some extent because they also forfeited accumulated seniority upon transfer, they could progress on the basis of seniority within their units. The court held that "the seniority system negotiated through the collective bargaining process tracked and reinforced the purposefully segregated job classification scheme maintained by the company and the conclusion is inescapable that the seniority system itself shared in that same unlawful purpose." Id. at 936.
 
 
 67
 Here, after the BRT succeeded in obtaining all braking work for its white members, chair car attendants had "no chance to progress except by transfer to another section with loss of seniority." See id. at 931; compare Gantlin, 734 F.2d at 985-88, 991-92. Although switchmen and brakemen would forfeit accumulated seniority if they crossed craft lines, they were able to move within their crafts on the basis of seniority, switchmen to engine foremen and brakemen to conductor. If the placement and retention of blacks in jobs without the possibility of promotion was intentional, it would be strong evidence that the system was operated with the intent to discriminate on the basis of race.
 
 
 68
 The judgment of the district court is VACATED and the case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Juan G. Burciaga, United States District Judge for the District of New Mexico, sitting by designation
 
 
 [1]
 The Sears class was divided into two subclasses as follows: (1) plaintiffs who had train porter seniority prior to April 20, 1942, and who still were employed as train porters on the effective date of Title VII; and (2) plaintiffs who had train porter seniority after April 20, 1942, were reclassified as chair car attendants as a result of Award 19324, discussed post at pp. 1240-41, and who still were employed as chair car attendants on the effective date of Title VII. Sears II, 645 F.2d at 1370
 
 
 [2]
 The original Blankenbaker class was part of the Sears litigation, but was severed from that action on October 29, 1974. Blankenbaker, slip op. at 5. Thereafter, two other cases were consolidated with Blankenbaker to complete this class action. One was brought by plaintiff George H. Harvey on behalf of himself and a class of chair car attendants. Harvey had settled his claim against Santa Fe in 1973, and his remaining claims against UTU were consolidated with the Blankenbaker action. Id. at 5-6. The second action involved claims by plaintiff Ray E. Landrum, who intervened in Sears. Landrum later was excluded from the Sears class and settled his claims against Santa Fe in 1976. Id. at 6. His claims against UTU were consolidated in this action. Id
 
 
 [3]
 Plaintiffs also specifically challenge the district court's finding that UTU's agreement to the Seniority Modification Agreement, discussed post at p. 1241, was unnecessary for the Agreement to be fully implemented. We conclude that this finding was clearly erroneous, see post at p. 1250, but do not decide whether UTU's failure to sign the agreement has any significance independent of the seniority system issue
 
 
 [4]
 For example, Donald Tousant, a black, was hired as a brakeman/switchman on the Coast Lines in 1962. Blankenbaker, slip op. at 27, 32. Jerry Brown, a black, was hired as a switchman in the Chicago Terminal in 1965. Id. at 32. The first black hired as a brakeman on the Eastern Lines was in 1968. Id. at 31. The first black brakeman on the Colorado Division was hired in 1971. IV R. 470; V R. 700. The major exception to the all-white, pre-Act composition of the brakemen/switchmen work force was in the Silsbee, Texas, Seniority District. According to the trial court in Sears I, this district "has been something of an anomaly in the history of the Santa Fe, for black rather than white males have been predominantly employed as brakemen in that district." 454 F.Supp. at 166 n. 9
 
 
 [5]
 In Sears I, the district court explained how the extra-board system worked as follows:
 "Working off the extra board generally meant that the employee was available for call to temporarily take the place of an employee who did hold a regular job, but who was absent for reason of illness, vacation or otherwise. The employee called off the extra board would be protecting the job or work for which he was called."
 
 
 [454]
 F.Supp. at 166 n. 8
 
 
 [6]
 According to the district court in Sears I, "[w]hen vacancies occurred in regularly held or full-time jobs, the jobs would be 'advertised' for bid by Santa Fe, usually through a bulletin, and the employee with the most seniority who bid pursuant to the advertisement got the job." 454 F.Supp. at 166
 
 
 [7]
 The defendants' expert witness testified that the train porter craft was unique to the United States. IX R. 1459-60
 
 
 [8]
 During the war, the federal government took over administration of the nation's railroads. The Director General of Railroads issued General Order 27, which provided that "[e]ffective June 1, 1918, colored men employed as firemen, trainmen and switchmen shall be paid the same rate of wages as are paid white men in the same category." Sears I, 454 F.Supp. at 163 n. 4. Subsequent interpretations of this order made it clear that it was intended to equalize wages paid to black train porters who performed the same duties as white brakemen. See Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768, 771, 72 S.Ct. 1022, 1024, 96 L.Ed. 1283 (1952); Plaintiffs' Trial Exh. V, contained in Addendum to Brief of Appellant, vol. I, tab A-8 at 19, 46
 
 
 [9]
 According to the district court, "[t]he animosity directed toward black train porters by BRT was well-documented in the annals of judicial opinions." Blankenbaker, slip op. at 14; see, e.g., Howard v. Thompson, 72 F.Supp. 695, 698-99 (E.D.Mo.1947), aff'd in part and rev'd in part sub nom., Howard v. St. Louis-S.F. Ry., 191 F.2d 442 (8th Cir.1951), aff'd sub nom. Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952); Randolph v. Missouri-K.-T. R.R., 68 F.Supp. 1007 (W.D.Mo.1946), 7 F.R.D. 54 (W.D.Mo.1947), rev'd and remanded, 164 F.2d 4 (8th Cir.1947), cert. denied, 334 U.S. 818, 68 S.Ct. 1082, 92 L.Ed. 1748 (1948), on remand, 78 F.Supp. 727 (W.D.Mo.1948), 85 F.Supp. 846 (W.D.Mo.1949), aff'd, 182 F.2d 996 (8th Cir.1950), 209 F.2d 634 (8th Cir.1954) (affirming trial court on merits)
 
 
 [10]
 See Hunter v. Atchison, T. & S.F. Ry., 78 F.Supp. 984, 988 (N.D.Ill.) (order granting temporary injunction), aff'd, 171 F.2d 594 (7th Cir.1948), cert. denied, 337 U.S. 916, 69 S.Ct. 1157, 93 L.Ed. 1726 (1949), 188 F.2d 294, 302 (7th Cir.1951) (reversing and remanding order for permanent injunction)
 
 
 [11]
 The district court's opinion, see Blankenbaker, slip op. at 23, can be read to infer that the only union signatory to the agreement was the Brotherhood of Railroad Signalmen. But see VIII R. 1164-65 (union signatories included the Brotherhood of Railroad Signalmen, Railroad Yardmasters of America, the Brotherhood of Maintenance of Way Employees, and BRAC)
 
 
 [12]
 Later cases have found that Sec. 703(h) immunizes bona fide seniority systems that perpetuate post-Act discrimination, see United Air Lines, Inc. v. Evans, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977), explained in Teamsters, 431 U.S. at 348 n. 30, 97 S.Ct. at 1861 n. 30, and "makes no distinction between seniority systems adopted before its effective date and those adopted after its effective date," American Tobacco Co. v. Patterson, 456 U.S. 63, 76, 102 S.Ct. 1534, 1541, 71 L.Ed.2d 748 (1982)
 
 
 [13]
 This commonly is referred to as offensive collateral estoppel--"a plaintiff is seeking to estop a defendant from relitigating the issues which the defendant previously litigated and lost against another plaintiff." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 329, 99 S.Ct. 645, 650, 58 L.Ed.2d 552 (1979)
 
 
 [14]
 Rule 8(c) provides that "[i]n pleading to a preceding pleading, a party shall set forth affirmatively ... estoppel, ... res judicata, ... and any other matter constituting an avoidance or affirmative defense."
 
 
 [15]
 The rule that issue preclusion must be raised pretrial obviously would give way when, for instance, cases are tried simultaneously or nearly so. See Harbeson v. Parke Davis, Inc., 746 F.2d 517, 520 (9th Cir.1984) (defendant asserted issue preclusion). Plaintiffs can make no such argument here. The district court entered its decision in Sears I on June 14, 1978, we affirmed that decision in Sears II on March 11, 1981, and the Supreme Court denied certiorari on May 3, 1982
 
 
 [16]
 The district court stated the first factor as follows: "Does the seniority system apply equally to all races, discouraging transfers of all employees, whites as well as blacks, between crafts? " Blankenbaker, slip op. at 41 (emphasis added). The Stockham Valves court stated the factor as "whether the seniority system operates to discourage all employees equally from transferring between seniority units." 559 F.2d at 352, quoted in Sears II, 645 F.2d at 1372 n. 5 (emphasis added). Plaintiffs allege that the district court's substitution of "crafts" for "seniority units" was legal error. We do not agree. In this case, "crafts" and "seniority units" are synonymous
 
 
 [17]
 The district court stated this factor as follows: "Is the separation of bargaining units rational and in accord with general industry practices?" Blankenbaker, slip op. at 45. The Stockham Valves court referred to this factor as "whether the seniority units are in the same or separate bargaining units (if the latter, whether that structure is rational and in conformance with industry practice)." Stockham Valves, 559 F.2d at 352, quoted in, Sears II, 645 F.2d at 1372 n. 5. Because in the instant case the relevant seniority units, chair car attendant and brakemen/switchmen, were separate bargaining units, the district court's paraphrase of this second factor was correct
 
 
 [18]
 The district court reached this conclusion because brakemen and switchmen are operating personnel and chair car attendants performed a nonoperating function. Blankenbaker, slip op. at 45-46. The district court also noted that in "nations of homogeneous race, e.g., Japan and Mexico, [the] chair car attendant craft has always been operated as a separate craft and maintained under a separate seniority system form [sic] those operating employees." Id. at 46 (citing IX R. 1468)
 
 
 [19]
 For a discussion of the dispute between the BRT-led stewards and the all-black craft of "waiters-in-charge" which bears an eerie resemblance to the circumstances surrounding Award 19324, see Allain v. National R.R. Adjustment Bd., 120 F.Supp. 453 (N.D.Ill.1953), aff'd sub nom. Allain v. Tummon, 212 F.2d 32 (7th Cir.1954); Dwellingham v. Thompson, 91 F.Supp. 787 (E.D.Mo.1950), aff'd sub nom. Rolfes v. Dwellingham, 198 F.2d 591 (8th Cir.1952); Plaintiffs' Trial Exh. AA, H. Northrup, Organized Labor and the Negro 96-97 (1944), contained in Addendum to Brief of Appellant, vol. II, tab A-9 at 156 [hereinafter Plaintiffs' Trial Exh. AA]
 
 
 [20]
 The district court stated this factor as "[d]id the brakemen-switchmen seniority system have its genesis in racial discrimination?" Blankenbaker, slip op. at 47
 
 
 [21]
 This factor was formulated by the district court as follows: "Was the system negotiated and has it been maintained free of any illegal purpose?" Blankenbaker, slip op. at 49
 
 
 [22]
 Award 19324 is not the only example of the BRT's use of a seniority system to discriminate against blacks. In Central of Ga. Ry. v. Jones, 229 F.2d 648 (5th Cir.1956), the BRT and the railroad entered into a contract in 1952 whereby blacks were excluded from holding certain jobs even though they were represented by the BRT. Under the agreement, blacks could use accumulated seniority to avoid layoffs or bid on vacancies or new runs in their crafts, but "negroes [were] not to be used as conductors, flagmen, baggagemen or yard conductors." Id. at 649 n. 1. In Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), the employer, under threat of a strike, agreed with the BRT to fire black train porters on its lines and replace them with white brakemen. The Supreme Court held that the Railway Labor Act "prohibits bargaining agents it authorizes from using their position and power to destroy colored workers' jobs in order to bestow them on white workers." Id. at 774, 72 S.Ct. at 1025. The Supreme Court noted that "these train porters are threatened with loss of their jobs because they are not white and for no other reason," id. at 773, 72 S.Ct. at 1025, and that "for more than a quarter of a century the [BRT] and other exclusively white rail unions had continually carried on a program of aggressive hostility to employment of Negroes for train, engine and yard service." Id. at 771, 72 S.Ct. at 1024
 
 
 [23]
 For example, plaintiff Martin Tuggle testified that he was hired as a chair car attendant on the Santa Fe in 1948. III R. 40. When Amtrak took over passenger rail service in 1974, he joined Amtrak and remained as an attendant until he retired in 1982. Id. at 62. Thus, he worked 26 years on the Santa Fe without a promotion. Plaintiff William Zanders was hired as a chair car attendant on the Santa Fe in 1947. Id. at 129. He transferred to Amtrak in 1974 and retired in 1981. Zanders worked on the Santa Fe for 27 years without a promotion. Id. at 130
 
 
 [24]
 Thus, our prior opinions in Bach, 731 F.2d at 668, and Sears II, 645 F.2d at 1372 & n. 5, cannot be read as an endorsement of the exclusive use of the Stockham Valves factors